# Charleston.

## JOHN S. ARNOLD vs. BENJAMIN F. KELLY.

### January Term, 1871.

1. The tortious or unlawful taking of personal property, and the exercise of ownership and dominion over it, against the consent of the owner is, in law, a conversion of the property for which trover will lie.

2. The action of trover may be maintained in the case of an unlawful taking or intermeddling with personal property, against the wishes or consent of the owner, although the property may have been returned to him before the institution of his suit. And a judgment for the full value of the property vests the title to it in the defendant, unless the property has been returned uninjured and unimpaired in value; in which event the plaintiff could only recover damages for the detention.

3. It appearing in this case, that the horse in question had been seriously injured and perhaps rendered worthless after the conversion, and before he was placed in the custody of the plaintiff's agent, the measure of damages was the fair value of the horse at the time of conversion, and the jury might fairly imply that the price paid for the horse shortly theretofore, was the fair value at the time of such conversion.

Action of trover and conversion, brought by B. F. Kelly, against John S. Arnold, in the circuit court of Mineral county. Suit began in 1866, judgment for the plaintiff for 350 dollars, in March, 1869. The only question considered by this court, was the motion made by the defendant in the court below, to set aside the verdict and grant a new trial, because the verdict was not sustained by the evidence. The following is all the testimony introduced in the case, as it appeared in the bill of exceptions:

"B. F. Kelly, the plaintiff, was introduced as a witness on his own behalf, and testified that the citizens of Wheeling, in the year 1861, presented him with a horse, the same for

which this suit is brought; that the night General Crook and himself were captured by the rebel forces, at Cumberland, Maryland, to wit, on the 21st day of February, 1865, the said horse was at Cumberland, in his possession; and the next day he saw the defendant, John S. Arnold, riding the horse along with the company of rebel cavalry commanded by Captain McNeil, which had captured the witness and was carrying him as a prisoner to Richmond, Virginia; that on the South Fork, in Hardy county, on the next evening, witness requested said McNeil to take the horse himself, keep him until after the war, and then witness would give a large price or another horse for him; witness explaining to said McNeil the peculiar value of said horse to him, said plaintiff, on account of the manner in which he came by said horse; that witness has never since seen said horse; the last he saw of said horse defendant was riding him as aforesaid. In the winter of 1865-6, witness met General Rosser, former General in the rebel army, at Richmond, Virginia, and told Rosser that he would like to have said horse back, and explained to him the said peculiar value of the said horse; that Rosser told him he was a captured horse, and his former orderly had him, and as he was a captured horse he supposed he, the said orderly, would want to claim him; that the horse had been badly wounded and was then near Staunton, Virginia. General Rosser, however, said that so far as he was concerned he would turn over the horse to him with pleasure, but did not give him an order on his orderly for him, but acted in a gentlemanly manner about it. Rosser suggested to witness to get General Terry, a United States officer and military commandant at Richmond, to send Federal military after the horse, and take him from said orderly by such military force; the witness accordingly applied to General Terry, who sent a sergeant with an order to get the horse, and said orderly was directed by witness to leave him when he did get him with one Colonel M. Harmon, of Staunton, for witness; that said sergeant did get the horse, as witness under-

stood, and did leave him with said Harmon for witness, as directed by witness, and that Harmon has kept him for witness ever since; the said horse has been in no condition for witness to bring away on account of the effect of his wounds; that said Harmon now has said horse in his possession, keeping him for witness, and subject to his orders; that said horse cost 350 dollars, but witness would not have taken 500 dollars for him. Witness has never gotten said horse from said Harmon, nor has he ever received any pay for him; said horse is not fit for service."

The defendant brought the case here for review.

Hon. John A. Dille, of the III circuit, was holding the term of court at which this case was tried.

C. Boggess, for the plaintiff in error.

Faulkner, and Stanton & Allison, for the defendant in error.

It is claimed that the court erred in not granting a new trial, because the verdict was against the law and the evidence.

No objection was made to the evidence, and the only question is, did it sustain the verdict?

There is no doubt, we think from the evidence, that the horse was taken and converted by the defendant without the consent of the plaintiff, who was the owner thereof. It was improperly taken from the possession of the plaintiff on the night of the 21st of February, 1865, at Cumberland, Maryland, and the next day the defendant was seen riding the horse along with a company of rebel cavalry, commanded by Captain McNeil. That the next day the plaintiff requested Captain McNeil to take the horse himself, and keep him for the plaintiff until after the war, but McNeil did not agree to do so—in fact, made no reply. There was no evidence that McNeil ever had the horse, or had anything to do with him. The last that was seen of the horse during the war, he was still in the possession of the defendant, who was riding him. The proof was, that the horse was worth

from 350 to 500 dollars, when taken, and was afterwards, during the war, used up by reason of wounds, so that as late as the trial of this case below, in March, 1869, the horse was not in a condition to be used, and was worthless, by reason of the wounds so received.

The amount of the judgment was, therefore, not too high.

It is also claimed that the horse was returned to the possession of the plaintiff before this suit was ‘brought, and that therefore trover could not be maintained.

In Bacon's Abridgement it is said, speaking of this action of trover: "The action then, being founded upon a conjoint right of property and possession, any act of a defendant which negatives, or is inconsistent with such right, amounts in law to a conversion. It is not necessary to a conversion that there should be a manual taking of the thing in question by the defendant; it is not necessary that it should be shown that he has applied it to his own use, though such be the allegation in the declaration. Does he exercise a dominion over it in exclusion or in defiance of the plaintiff's right? If he does, that is, in law, a conversion, be it for his own or another person's use. Hence, a re-delivery of the thing will not protect him from the action. Hence nothing can be pleaded in bar of it, but matter *dehors* or unconnected with the transaction; such as a release, former recovery, and the statute of limitations." 9 Bacon's Abridgement, 630, title, "Trover."

"If J. S. take the goods of J. N. unlawfully, this is a conversion; such taking being a disposing of the goods as if they were the goods of J. S.

"If one person dispose of the goods of another for the benefit of a third person, this is a conversion, for the injury to the owner of the goods is the same as if they had been disposed of for the benefit of the disposer.

"Thus, a servant converting goods for the benefit of his master, may himself be charged in trover; and this whether he has any authority or not from his master." 9 Bacon's Abridgement, 631 and 632.

BERKSHIRE, *President.*

There is no assignment of errors in this case, and the only questions that appear in the record are, the demurrer to the defendant's two special pleas, and the overruling of the motion for a new trial, upon the ground that the verdict was contrary to the evidence.

It was not claimed in the argument here, that there was any error in sustaining the demurrer to the pleas; but it was insisted that the verdict was not sustained by the evidence. First, because *no conversion* of the *property* was shown by the testimony. Second, because trover could not be maintained in the case, inasmuch as it appeared by the evidence that the horse, for the conversion of which this suit was instituted, had been reclaimed by the plaintiff, and was in the possession of his agent at the time of the institution of this suit. And also for the reason, that neither the value of the horse, nor the damages sustained by the plaintiff, could be ascertained from the evidence in the case.

The proposition is too well established to admit of discussion, that the *tortious*, or unlawful taking of personal property and the exercise of ownership and dominion over it, against the consent of the owner is, in law, a conversion of the property for which trover will lie. 2 Tucker, 87–89; 9 Bacon's Ab., 630–3; *Prescott* v. *Wright*, 6 Mass., 20; *Pierce* v. *Benjamin*, 14 Pick., 356; 6 Mod., 212; Clayt., 112; *Wyatt* v. *Blades*, 3 Camp., 396; 2 Hilliard on Torts, 96, 114–15.

It appears from the testimony, that the horse, now in question, was taken from the possession of the plaintiff, (then the owner) against his consent, and was found in the possession of the defendant shortly thereafter, who rode him off and exercised a dominion and acts of apparent ownership over him, against the consent of the plaintiff, and in defiance of his rights. This, according to the authorities, was a clear conversion of the property, and would consequently sustain an action of trover and conversion.

It would also seem to be equally well settled that the action may be maintained, in the case of an unlawful taking

or intermeddling with personal property, against the wishes or consent of the owner, although the property may have been *returned* to him before the institution of his suit. And a judgment of the full *value* of the property vests the title to it in the defendant, unless the property has been returned *uninjured* and unimpaired in value, in which event the plaintiff could only recover damages for the detention. 9 Bacon Ab., 631; 2 Tucker, 8; 4 Starkie, 1507; Strange, 1078; *Wheelock* v. *Wheelwright*, 5 Mass., 104; *Homer* v. *Thayring*, 3 Pick., 492.

The remaining question is the amount of damages found by the jury.

The proofs show that the horse in question was purchased shorty before the taking by the defendant, for the sum of 350 dollars, and that a much higher ·estimate was placed upon him by the plaintiff at the time of the conversion. From this, I think the jury might very properly imply that the price paid for the horse was the fair value of him at the time of the conversion by the defendant, and that being the measure of the plaintiff's damages, (it appearing that the horse had been seriously injured, and, perhaps, rendered worthless after the conversion, and before he was placed in the custody of the agent of the plaintiff,) I think there was no error in the court sustaining the verdict. *Hall* v. *Burgess*, Gray, 12.

There being, in my view, no error in the judgment complained of, it must be affirmed with costs and damages.

The other judges concurred.

JUDGMENT AFFIRMED.