[No. 24852. Department Two. April 11, 1934.]

CONTRACTORS MACHINERY AND STORAGE COMPANY, *Respondent,* v. M. M. STEWART *et al., Appellants.*[1]

*Herbert Cochran, Walter Christian,* and *Davis, Groff & Moran,* for appellants.

*J. W. Graham* and *Morris & Dubuar,* for respondent.

GERAGHTY, J.—This was an action by the plaintiff against the defendants for the recovery of the value

[1]Reported in 31 P. (2d) 546.

of a quantity of steel rails, fish plates and switch frogs and points, the property of plaintiff, alleged to have been taken and converted by defendants. The cause was tried to the court, and from findings and conclusions favorable to plaintiff, this appeal is taken by the defendants.

The appellants concede in their brief that there was sufficient testimony, if believed, to justify the trial court's finding of an original conversion by appellant Stewart. They contend, however, that, after the conversion, there was an accord and satisfaction between Stewart and respondent, which, until set aside, constituted a bar to an action on the original conversion. They argue that the respondent had the option either to sue for the damage it had sustained by the fraudulent representations inducing it to make the settlement, or to disaffirm the settlement and sue upon the original cause of action and that, before it could pursue the latter course, it would be required to place the appellants in *statu quo* by returning, or tendering the return of, the sum received by it in settlement. Subordinate to this issue affecting all of the appellants, appellants Keagy and Bald Point Logging Company contend the facts do not warrant the court's finding the conversion as to them.

The facts, in so far as it is necessary to state them in relation to these issues, are substantially as follows: The respondent was the owner of certain logging equipment, including several miles of steel rails, at an abandoned logging camp on Hood Canal, referred to in the record as the C B & M camp. It employed H. A. Wilson, who owned a boat and scow, to transport this material from the logging camp to Seattle, where respondent conducted its business as a dealer in this class of material. Appellant Stewart was engaged in organizing a logging operation at Bald Point, on Hood

Canal, and, in the summer of 1932, also employed Wilson to transport for him some logging equipment from another abandoned camp, called the Cyclone Miller camp.

By September, 1932, Wilson had taken part of the material from the C B & M camp to Seattle, but a great deal of it remained at the camp. About the time Wilson finished the transportation of the material from the Cyclone Miller camp to Bald Point, Stewart engaged him to transport a scowload of rails and other logging equipment from the C B & M camp to Bald Point. This scowload of material was delivered by Wilson at the Bald Point camp on September 17th. The material was unloaded by dumping it in the water of the bay about two or three hundred feet from the shore. This scowload of material, as the trial court later found, amounted to sixty-five tons of rails and a quantity of fish plates, switch frogs and points. In the shipment, it appears there were fifteen or sixteen rails belonging to respondent taken back by Wilson from Seattle. It appears that, earlier in the year 1932, Stewart, learning that respondent was the owner of rails and logging material at the C B & M camp, had had some negotiations with H. C. McDonald, the manager and principal stockholder of respondent, for the purchase of rails at the camp, but no purchase was consummated.

Wilson testified that his arrangement with Stewart was that he was to have twenty-five dollars a day for the use of his boat, scow and gasoline donkey for transporting the material from Cyclone Miller camp, as well as the C B & M camp, and that Stewart was to furnish the men and groceries to feed them. Stewart contended that Wilson was to be paid a flat figure of $475, and this sum was to include the price of the material delivered by Wilson from the C B & M camp.

Whatever the basic agreement was originally, the sum of $475 seems to have been the agreed amount Wilson was to receive.

After the delivery of the C B & M material at the Bald Point camp, Stewart, presumably on account of a garnishment served upon him in a suit against Wilson, communicated with McDonald, and advised him that Wilson had delivered a quantity of rails, some forty-odd, at Bald Point, taken from the C B & M camp, and that, before settling with Wilson, he wanted to arrive at an understanding as to the ownership of the rails. McDonald testified that Stewart told him Wilson had delivered forty pieces of rail, and that he and Stewart agreed on a price of fifteen dollars per ton. The rails would weigh eight tons. Shortly after this conversation with Stewart on September 27th, the respondent mailed to Stewart, at Aberdeen, an invoice for eight tons of forty-pound rails, at fifteen dollars a ton, or $120. On receipt of this invoice, Stewart wrote McDonald, respondent's manager, a letter, reading in part as follows:

''I received your invoice for $120. I wish you and Mr. Wilson would get together and decide whether this $120 is to be taken off the money owed by me or how this matter is to be straightened out, as there seems to be a dispute in Wilson's right to deliver the rails to me.

''I do not intend to settle with Wilson until title for same is furnished. He has not lived up to his agreement; we are now garnisheed from paying him by the Schively Tow Boat Company and we have this invoice for $120.

''We owe him at the present time, provided the title to the rails delivered us is genuine and free from encumbrances, the sum of $275.

''Apparently the situation revolves itself into one where you have $120 coming and the other $155 should be paid into court by me, leaving Mr. Wilson nothing due him direct.

"In the meantime I will rest the matter until it is finally adjusted by the courts or an amicable settlement."

Again, on October 31, 1932, in accordance with its practice of mailing monthly statements, the respondent mailed to Stewart a bill for $120, referring to its invoice theretofore rendered on September 27th.

On November 5th, Stewart and appellant Keagy went to respondent's place of business in Seattle, and there met McDonald and Wilson, and, after some discussion, McDonald, was given, for his company, Stewart's check for $120, and Wilson was given a check for $174.58, in full of the balance due him. The receipt given by the respondent to Stewart was as follows:

"Seattle, Wash., Nov. 5, 1932.

"Received of M. M. Stewart, One Hundred Twenty and no/100 Dollars ($120) in full settlement for all steel and track materials delivered by H. A. Wilson at Bald Point Logging Company's camp, Mason county, Washington.     CONTRACTORS MACHY. AND STG. CO.,
"H. C. McDonald."

This receipt constitutes the basis for the claim of the appellants that an accord and satisfaction had been entered into between Stewart and respondent.

McDonald testified that, at the time of settlement, he asked Keagy if he had counted the rails, and Keagy said he had, and that there were forty pieces. Wilson, who was present, testified to the same effect. Keagy denied that he had made the statement at that time, or at any other time, that he had counted the rails and that there were only forty. He also testified that McDonald wanted Stewart to accept a receipt reciting payment for eight tons of steel, and Stewart said he would not accept a receipt for eight tons because there was more steel than eight tons, and that he asked

McDonald two or three times to go over and look at the material and that McDonald declined to go.

The court found that there had been no accord and satisfaction. This finding we think was supported by a preponderance of the evidence. Apart from the improbability that McDonald, with knowledge of the circumstances, would accept in full settlement one-tenth of what the trial court subsequently found was the value of the rails and material converted, the evidence clearly shows that, at all times, McDonald dealt on the assumption that only approximately forty rails, amounting in weight to eight tons, was involved, and Stewart and Keagy knew this. Translating the transaction between them into plain language, it would amount to no more than this: Stewart said to McDonald: "Wilson has brought us forty of your rails, and we want to pay you for them. What are they worth?" McDonald: "They are worth fifteen dollars a ton. If that is the number of rails taken, you owe me $120." The court, in effect, found that the receipt contemplated only an acknowledgement of payment for the eight tons, and awarded judgment for the value of an additional fifty-seven tons, and the frogs, points and plates converted and not covered by the settlement of November 5th.

What we have said with reference to the issue of accord and satisfaction, disposes as well of appellants' contention that, before maintaining this suit, respondent should have tendered the return to appellants of the money received by it in settlement.

This brings us to a consideration of the question whether the court was correct in its finding that Keagy and the corporation were parties to the conversion of respondent's property.

Whatever may have been Keagy's relation to the Bald Point logging operation at the time of the

conversion, there is evidence supporting the court's finding that he participated in the deception practiced upon McDonald, respondent's manager, and aided Stewart in converting respondent's property. Having done so, he became liable with Stewart, whether he then had any interest in the enterprise or not.

"The law is that, where one aids and assists in a wrongful taking of chattels, he is liable for conversion, the same as the active participants. In *Starr v. Bankers' Union of the World,* 81 Neb. 377, 116 N. W. 61, it was said:

" 'Where several parties unite in an act which constitutes a wrong to another under circumstances which fairly charge them with intending the consequences which follow, it is a very just and reasonable rule of the law which compels each to assume and bear the responsibility of misconduct of all. Cooley on Torts (2d Ed.) 153. Hence it is held that one who aids and assists in a wrongful taking of chattels is liable for the conversion, although he acted as agent for a third person. (Citing authorities)'." *Davin v. Dowling,* 146 Wash. 137, 262 Pac. 123.

We next consider the contention of appellant Bald Point Logging Company that it became a purchaser without notice of the original conversion. It claims to have taken title to the property here involved by bill of sale from Stewart in payment of his stock subscription. The logging company was organized by Stewart and Keagy, as its principal promoters, for the purpose of taking over the equipment at Bald Point camp and conducting the logging operations then in contemplation by them. Another of the organizers of the company was Joe Downer. Stewart, Keagy and Downer were elected trustees at the stockholders' meeting, and Stewart was elected president and Keagy secretary of the corporation. Stewart testified that it was his purpose, in assembling equipment for the log-

ging camp, to organize a corporation to take it over and carry on the logging operations.

We have already referred to the connection of Stewart and Keagy with the conversion of respondent's property. Downer testified that he became a stockholder and trustee of the Bald Point Logging Company on November 19th, and that, when Stewart and Keagy had returned to camp after the settlement with McDonald, he heard Keagy say that they had made a "slick" deal. He inquired of Keagy what he meant by a "slick" deal, and Keagy answered they got McDonald to sign a receipt for all the rails for $120, as railroad material. One Devenny, who was also in some way interested in the logging operation, testified he was present at this conversation, and corroborated Downer. Possessing this information, Downer became a trustee of the logging company.

These were the men who were the principal stockholders, trustees and officers of the appellant corporation, and it is hard to conceive how knowledge of the transaction could have been brought home more forcefully to the corporation. The corporation was the creation and instrument of Stewart, Keagy and their associates. They should not be permitted, under the circumstances disclosed by the record here, to appropriate other people's property, then organize a corporation under their own control to take the property over and hold it for them, freed of the consequences of their wrongful acts.

"As to the leases assigned to O'Brien and thence to Spokane Wyoming Oil & Gas Company, respondents O'Brien and Spokane Wyoming Oil & Gas Company claim they are entitled to protection as innocent purchasers. There is some proof from interested parties in favor of such claim, but we are satisfied by the clear preponderance of the evidence that, prior to the transfer to O'Brien by Vallentine, O'Brien and Alvis had

full information of appellant's rights and that the respondent corporation, which was shortly formed by O'Brien and Alvis as its leading spirits and officers, is chargeable with that notice and entitled to no protection." *Walla Walla Oil etc. Co. v. Vallentine,* 103 Wash. 359, 174 Pac. 980.

Appellant logging company also contends that it offered to return the material to the respondent. Respondent was under no obligation to receive back the property after its conversion by appellants. The use and possession of the property by them being in law a conversion, respondent could rightly treat it as such, and hold them to answer for it. *Fidalgo Island Shingle Co. v. Brown,* 61 Wash. 516, 112 Pac. 629.

The judgment must be affirmed.

BEALS, C. J., BLAKE, STEINERT, and TOLMAN, JJ., concur.