**Leon BAKER, Appellee,**

**v.**

**The KROGER CO., an Ohio corporation, Appellant.**

**No. 85–1663.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 6, 1986.

Decided Feb. 27, 1986.

Rehearing Denied March 25, 1986.

————

John C. Palmer, IV (Rebecca L. Stepto, Robinson & McElwee, on brief), for appellant.

Marvin W. Masters (Janet R. Gerwig, Masters & Taylor, on brief), for appellee.

Before HALL and SNEEDEN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

K.K. HALL, Circuit Judge:

The Kroger Company ("Kroger") appeals a judgment entered on a jury verdict in favor of Leon Baker in Baker's action for malicious prosecution and tortious interference with his employment contract. Baker was awarded $1,400,000, comprised of $600,000 in compensatory damages and $800,000 in punitive damages, in this diversity action. We affirm in part and reverse in part.

## I.

The evidence presented to the jury was in many instances conflicting. Baker was employed by Frito-Lay, Inc. ("Frito-Lay") as a route salesman and was responsible for delivering snack food products by truck to various retail grocery stores, including Kroger's store in Fairlea, West Virginia. Besides delivering new supplies of snack foods to Kroger, Baker would also remove and replace outdated or damaged bags from the shelves of the stores.

Baker made his deliveries to the Kroger store in Fairlea in the early morning hours, normally on Mondays, Wednesdays, and Fridays. According to Baker's evidence, the employees made him wait to be "checked in" while they gambled, made him call the store manager at home early in the morning, made him "rotate" or sort his own stock on the shelves, and were "smart alec" to him. Some, but not all, Kroger employees denied that these problems existed.

Kroger's evidence demonstrated that in December, 1981, and early January, 1982, two incidents caused Kroger clerks to become suspicious that Baker was not bringing in bags of chips to replace outdated or damaged ones. These incidents were reported by clerk Rick Spinks to Ken Stover, the store manager. Stover told Spinks to keep an eye on Baker for the next few deliveries. On January 15, 1982, while Baker was making his deliveries to the Fairlea store, certain disputed events transpired which resulted in Baker's arrest for shoplifting two bags of chips.

According to Kroger's evidence, Baker removed two bags of damaged chips from the shelves and replaced them with two bags of chips already on Kroger's shelves, instead of replacing them with new bags brought in from his truck. Baker on the other hand maintained that he had the replacements in his truck but had forgotten to bring them into the store. In any event, before Baker left the store that morning he was stopped by a Kroger clerk under orders from the store manager, Stover. He was then taken to a magistrate's office by Stover and three Kroger clerks and charged with shoplifting. The warrant, signed by Stover, charged that

> Leon Baker did unlawfully not replace 2 bags of merchandise (Cheetos $1.19 and Tostitos $1.29) and did remove the damaged bags from the store. He took 2 bags off the shelf and said that they were his replacements. He told [Kroger employee] Danny Glover this.

Although Baker initially pleaded not guilty to the charge, he changed his plea to guilty. At trial, Baker testified that under the circumstances he felt intimidated and forced to plead guilty. He further testified that he was afraid of going to jail and did not have the $500 cash which he understood was necessary to post bond. Following his guilty plea, Baker was fined $40 plus $18 in court costs and ordered to pay Kroger $50 in restitution.

After returning to the store from magistrate court, Stover called John Bayes, Kroger's Zone Manager in Beckley, West Virginia, and reported the incident to him. Shortly thereafter, a telephone conversation took place between Bayes and Kevin O'Donnell, Frito-Lay's Regional Sales Manager, whose responsibilities included the supervision of route salesmen such as Baker. Testimony was conflicting as to who placed the call, but Bayes said he informed O'Donnell that he did not want Baker to service Kroger stores in the future. Baker was terminated by Frito-Lay on January

29, 1982. On January 16, 1982, the day following the incident, Baker retained an attorney, appealed his conviction, and eventually obtained an acquittal of the shoplifting charge on January 21, 1983.

On May 23, 1983, Baker filed the instant action alleging malicious prosecution and tortious interference with his employment contract. The jury found in Baker's favor and Kroger appeals.

## II.

On appeal, Kroger raises seven issues. It contends that the trial court erred in (1) not directing a verdict in Kroger's favor on Baker's claim for tortious interference with his employment contract; (2) not dismissing the tortious interference claim as barred by a one-year statute of limitations; (3) allowing issues of fraud, undue means, and deliberately false testimony to go to the jury; (4) refusing to permit Kroger to present evidence concerning the state circuit court's ruling that Baker's guilty plea was voluntary; (5) admitting evidence of additional charges which the state prosecuting attorney contemplated bringing but never brought during the course of Baker's shoplifting appeal; (6) admitting the opinion of plaintiff's expert witness on the impairment of Baker's future earning capacity; and (7) upholding the jury's award of compensatory and punitive damages, which Kroger argues is excessive.

Our review of the record, briefs, and oral argument convinces us that Kroger's first five contentions lack merit. However, we agree with Kroger's sixth contention that the evidence offered by Baker to support his claim of loss of future earnings was speculative and should not have been presented to the jury. Because of our disposition, we do not address Kroger's seventh and final contention concerning the excessiveness of the damages award. For the reasons stated in Part III of this opinion, we reverse the damages award in its

entirety and remand the matter for further proceedings in light of this opinion.

## III.

Unlike a typical personal injury case, Baker suffered from no physical impairment or other disability which affected his future employment. Ten months after his termination by Frito-Lay, Baker obtained employment as a fabric cutter at Kellwood Company ("Kellwood") at a lower rate of pay. To establish the amount of the alleged impairment of his future earning capacity, Baker, who was thirty-five years old at the time of trial, attempted to prove that the differential between his earnings at Frito-Lay and his earnings at Kellwood would continue for the 35 remaining years of his work-life expectancy.

To support this claim, Baker called Robert Williams, a vocational counselor, who testified regarding Baker's earnings at Frito-Lay and his earnings at Kellwood.[1] Williams stated that he had contacted certain other area employers and that, in his opinion, Baker, who was at that time earning $6.29 per hour at Kellwood, was "making as much now as he will ever make." When asked if he had an opinion as to the type of job opportunities that Baker would have in the future, the counselor testified that Baker's "best bet is to stay where he is." Williams further testified that Baker's arrest, prosecution and termination would "affect his employability in the future." According to Williams, Baker "will be confined to Kellwood at his age of 35" for the remainder of his working life.

On cross-examination, Williams admitted, however, that he thought that Baker would earn more money in the future, either at Kellwood or elsewhere, and that he could not say to a reasonable degree of certainty how much money Baker would earn:

Q Well, then, isn't that true, you can't predict the future regarding his pay?
A I can't predict it accurately or exactly in that context. There is no way I can

---

**1.** In 1981, Baker's last year with Frito-Lay, he earned $18,976.76. In 1983, his next full year of employment at Kellwood, he earned $7,392.42.

By mid-August, 1984, Baker had earned approximately $7,900.00 at Kellwood.

predict his or anybody else's pay exactly in the future. But based upon my experience with employers and my experience in dealing with people, I believe that he will earn more money because he's demonstrated that he's a person who wants to work.

Q Well, you think he will earn more money but you can't say to a reasonable degree of certainty how much money he's going to earn?

A Not how much if you want to nail it down to a dollar mark.

Williams further admitted that Baker could obtain a better job in the future, and that Baker did not have to remain employed at Kellwood forever.

Baker also called William Cobb, Ph.D, an economics professor, who testified that, based upon a comparison of future projections of Baker's then-current wages at Kellwood and his future projected increased earnings with Frito-Lay, Baker's wage loss through age 69 would be $681,151 reduced to present value. Cobb then testified about a second approach which assumed that Baker's wages at Kellwood would stay 2.2% ahead of inflation rather than remain at the then-current level at Kellwood; this calculation projected a wage loss of $589,248. Cobb conceded, however, that his calculations were based on the assumption that Baker's wage history at Kellwood would continue into the future, but that if Baker obtained a wage increase at either Kellwood or at other employment, then that would considerably change his wage loss projection.[2] In fact, Cobb admitted that if Baker could earn as much as he had earned at Frito-Lay, there would be no damages at all. Finally, the economist admitted that he did not know what jobs were available to Baker, but had merely looked at his wage history.

 Under West Virginia law, which governs this diversity action, competent evidence must prove to a degree of reasonable certainty that the plaintiff's capacity to earn has been impaired. *Jordan v. Bero*, 210 S.E.2d 618 (W.Va.1974). Only when this "reasonable certainty" standard is met can an expert's testimony be admitted. *Ilosky v. Michelin Tire Corp.*, 307 S.E.2d 603, 614 (W.Va.1983); *see also, Turner v. Heston*, 303 S.E.2d 718, 721 (W.Va.1983); *Flannery v. United States*, 297 S.E.2d 433, 435–36 (W.Va.1982), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984). Expert testimony must first establish the future effects of an injury to a reasonable degree of certainty. *Turner v. Heston*, 303 S.E.2d 718, 721 (W.Va.1983). Moreover, "[a] mere conjecture or *even a probability* does not warrant the giving of damages for a future disability which may never be realized." *Wilson v. Fleming*, 89 W.Va. 553, 559, 109 S.E. 810, 813 (1921) (emphasis added); *see also Bailey v. DeBoyd*, 135 W.Va. 730, 65 S.E.2d 82, 85 (1951).

 The necessary predicate for Baker's wage-loss projections for thirty-five years into the future was the assumption that Baker's future earnings would be based upon his current rate of pay at Kellwood or at least a similar rate of pay in other employment. That predicate, however, was destroyed by Williams' testimony that Baker could and would move to a better paying job in the future, and by his inability to testify to a reasonable degree of certainty that Baker's employment at Kellwood was the highest paying job that he

---

2. Q All right, sir. Now, when you were talking about his wages at Kellwood or similar employment, you were assuming in the course of that that his present hourly rate was six dollars and twenty-nine cents an hour. Is that correct?

A That's correct.

Q And you were assuming, in effect, as you would have to, that it was that employment, that wage history at Kellwood would follow him on into the future?

A That's correct.

Q All right, sir. Now, if you assumed that Mr. Baker obtained a better job and, say, had a two dollars an hour increase, then that would change, considerably change your wage projection as you have it listed for either Kellwood or other employment.

A Absolutely.

would ever have. Under these circumstances, we conclude that the evidence offered in support of Baker's future lost earning capacity was too speculative to have been submitted to the jury in this case. Because the jury's verdict awarding $600,000 to Baker in compensatory damages was obviously influenced by this improperly admitted evidence,[3] we conclude that this award of damages must be reversed. Moreover, because the extent of harm inflicted is one of the factors which may be considered in awarding punitive damages,[4] we also find that the $800,000 punitive damages award cannot stand.

### IV.

For the foregoing reasons, we affirm as to liability but reverse the damages award in its entirety. We remand only the issue of damages for further proceedings consistent with this opinion. On remand, Baker is of course entitled to come forward with additional evidence which would demonstrate with reasonable certainty the nature and extent of any future earnings impairment. We simply hold that it was error to admit expert opinion that Baker's current rate of pay is permanent and that his present employment is the highest paying job he will ever have.

AFFIRMED IN PART; and REVERSED IN PART and REMANDED.

---

**3.** The award of $600,000 in compensatory damages fell between the economist's projected loss of earnings of either $681,151 or $589,248. Moreover, during jury deliberations, the jury foreperson sent a written message to the district judge requesting information concerning the damages sought by Baker for lost wages and future lost earning capacity.

**4.** Although under West Virginia law, there does not have to be a reasonable relationship between compensatory and punitive damages, and punitives may be awarded even when there are no compensatory damages, *Wells v. Smith,* 297 S.E.2d 872 (W.Va.1982), the amount of actual damages may be one of the criteria which a jury can consider in assessing punitives. *Leach v. Biscayne Oil and Gas Co.,* 289 S.E.2d 197 (W.Va. 1982).