819 F.2d 1139
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
SHAMBLIN'S READY MIX, INC., a West Virginia Corporation,
Plaintiff-Appellee,
v.
EATON CORPORATION, an Ohio Corporation; RSH, Inc., d/b/a
Scott Equipment Company, an Ohio corporation,
Defendants-Appellants.
 No. 86-1114.
 United States Court of Appeals, Fourth Circuit.
 Argued March 2, 1987.
Decided May 26, 1987.
 
 Before RUSSELL and SPROUSE, Circuit Judges, and KISER, United States District Judge for the Western District of Virginia, sitting by designation.
 David Besserer Thomas (Spilman, Thomas, Battle & Klostermeyer, on brief), for appellants.
 Arden John Curry, II (Arden J. Curry; Pauley, Curry, Sturgeon & Vanderford, on brief), for appellee.
 RUSSELL, Circuit Judge:
 
 
 1
 This is a diversity suit for conversion of a hydraulic motor and pump. The plaintiff sought both actual and punitive damages. Following trial to a jury the court directed a verdict in favor of the plaintiff for $3,531 in compensatory damages. The jury then awarded punitive damages of $600,000 jointly and severally against the defendants. We affirm the directed verdict and the jury's determination that the defendants are liable for punitive damages. Because of inflammatory remarks by plaintiff's counsel during closing argument, however, we remand for a new trial on the size of the punitive damages award.
 
 I.
 
 2
 Plaintiff Shamblin's Ready Mix, Inc. (Shamblin), is a West Virginia company that sells ready-mix concrete. In July 1984 Shamblin contacted defendant Eaton Corporation (Eaton), an Ohio company whose products include hydraulic motors and pumps, about purchasing some equipment for use on a paddle wheel boat already owned by Shamblin. Eaton directed Shamblin to deal directly with defendant Scott Equipment Company (Scott), an Ohio company that was Eaton's local distributor in Charleston, West Virginia. Shamblin thereafter purchased an Eaton motor and pump from Scott for $2,800 each and installed them on the boat.
 
 
 3
 Shortly after the sale the equipment failed to work properly. Scott allegedly made an immediate offer to pick up the Eaton equipment and take it to Scott's facility in Ohio for free repair. Shamblin, however, apparently refused the offer of repair and demanded replacement with new units. Scott then withdrew its offer, effectively forcing Shamblin to rely on Eaton's warranty.
 
 
 4
 Shamblin brought the Eaton equipment back to Scott for consideration under Eaton's warranty. On October 2, 1984, Shamblins' attorney wrote a letter to Scott demanding replacement with new equipment rather than repair under a warranty. Also on October 2, 1984, Scott informed Shamblin by letter that there was contamination in the units that was unrelated to materials or workmanship, so that the warranty did not cover the cost of repair. Scott then shipped the equipment to Eaton for further warranty consideration, allegedly without Shamblin's knowledge or consent.
 
 
 5
 After Shamblin received Scott's letter denying warranty coverage, Shamblin allegedly telephoned Scott several times to demand return of the equipment in its unrepaired condition. By this time, of course, Scott was physically unable to return the equipment because it had already forwarded the motor and pump to Eaton. On October 15, 1984, Scott sent Shamblin a letter stating that Eaton's analysis of the equipment confirmed that the problems were the result of contamination, and that the warranty did not apply. Scott further informed Shamblin in this letter that Eaton could repair the units and return them with a new warranty at a cost of $2,069.
 
 
 6
 On December 20, 1984, Shamblin wrote to Scott demanding that the unrepaired equipment be returned within five days. Scott replied on December 21, 1984, reaffirming its previous position and telling Shamblin that this action was "strictly a corporate decision by Eaton in which neither myself nor Scott Equipment Company has any control over." The letter further advised Shamblin that "Eaton Corporation would be glad to discuss this matter with you at your convenience. Please call Vern Johnson at (612) 937-7118."
 
 
 7
 Shamblin did not accept the invitation to call Eaton. Instead, on January 8, 1985, Shamblin filed this suit against Scott and Eaton for conversion. Shamblin sought $6,453.38 for conversion of the motor and pump; $20,000 in compensatory damages for annoyance, inconvenience, embarrassment, and loss of business opportunities; and $100,000 in punitive damages. On January 30, 1985, prior to answering Shamblin's complaint, Eaton wrote to Shamblin and offered unconditionally to return the pump and motor. Shamblin refused the offer.
 
 
 8
 The case went to trial on January 22, 1986. After the close of evidence the court directed a verdict in favor of Shamblin for $3,531 in compensatory damages. The jury, after much deliberation, then awarded punitive damages of $600,000 against Scott and Eaton jointly and severally. The defendants appeal on numerous grounds, which we now address.
 
 II.
 
 9
 Initially, the defendants contend that the court erred in directing a verdict in favor of Shamblin on the issue of conversion.
 
 
 10
 When the evidence given on behalf of the defendant is clearly insufficient to support a verdict for him so that such verdict if returned by a jury, must be set aside, and the evidence of the plaintiff is clear and convincing, it is the duty of the trial court, when so requested, to direct a verdict for the plaintiff.
 
 
 11
 Keller v. Landis, 346 S.E.2d 58 (W.Va.1986) (citing Jones, Inc. v. W.A. Weidebusch Plumbing and Heating Co., 157 W.Va. 257, 201 S.E.2d 248 (1973)). Under this standard, the court properly granted Shamblin's motion for a directed verdict, as shown in the following analysis.
 
 
 12
 In West Virginia the common-law tort of conversion is defined as follows:
 
 
 13
 Any distinct act of dominion wrongfully exerted over the property of another, and in denial of its rights, or inconsistent therewith, may be treated as a conversion and it is not necessary that the wrongdoer apply the property to his own use. And when such conversion is proved the plaintiff is entitled to recover irrespective of good or bad faith, care or negligence, knowledge or ignorance.
 
 
 14
 Miami Coal Co. Inc. v. Hudson, 332 S.E.2d 114, 121 (W.Va.1985). Conversion may be proved in three ways: (1) by a tortious taking, (2) by any use or appropriation to the use of the defendant indicating a claim of right in opposition to the rights of the owner, or (3) by a refusal to give up the possession to the owner on demand. Haines v. Cochran Bros., 26 W.Va. 719, 723-24 (1885). The parties to the present suit all assume that the third method of proof is most appropriate to the facts of this case, and we adopt their assumption without considering whether the other methods of proof might also apply.
 
 
 15
 Where proof of conversion requires a demand for return of the property and a refusal of that demand, the demand must be made on a person who has possession or control of the property, and who would be obligated to surrender it with power to do so if he would. Evans v. Carroll & Co., 155 F.Supp. 662, 669 (D.Mont.1957), rev'd in part on other grounds, 259 F.2d 577 (9th Cir.1958). If the demand is on an agent or employee of the possessor the power to surrender the property must be within the scope of his agency or employment. Id. at 669. See also Mueller v. Technical Devices Corp., 8 N.J. 201, 84 A.2d 620 (1951).
 
 
 16
 The defendants assert here that there was no conversion by Eaton because Shamblin did not make any demand on Eaton, which was the defendant-in-possession. Shamblin was invited, by Scott's letter of December 21, 1984, to make a demand on Eaton, but Shamblin declined that invitation. The defendants also assert that there was no conversion by Scott because Scott did not have possession of the equipment at the time of Shamblin's demands, nor did it have authority or power to surrender the property.
 
 
 17
 We reject these arguments for two reasons. First, there was uncontroverted evidence that after Shamblin made its demands on Scott, Scott transmitted the fact of the demand to Eaton. Eaton in turn communicated to Scott its refusal to honor the demand. When the defendant-in-possession has actual knowledge of the owner's demand and refuses to surrender the property, no further demand by the plaintiff is necessary. Cutler-Hammer, Inc. v. Troy, 283 A.D. 123, 126 N.Y.S.2d 452, 454 (1953); see also Haines v. Cochran Bros., supra. Any contrary conclusion would permit defendants to avoid the consequences of their wrongful actions by shuffling the property back and forth so that possession and demand never coincided. Although we do not condone Shamblin's apparently baseless demands for replacement rather than repair, and we are cognizant of Shamblin's threat to sue for breach of warranty, the equipment indisputably belonged to Shamblin, and the defendants had no legal right to retain it.
 
 
 18
 Our second reason for rejecting the defendants' argument rests on Eaton's original direction that Shamblin should deal directly with Scott and not with Eaton. This action made Scott into Eaton's apparent agent for the sale of the motor and pump. Because consumers, absent other instructions, typically deal with the retailer when they discover a defect in goods that may be covered by warranty, the scope of the agency implicitly included the power to receive goods on behalf of Eaton for warranty consideration. Therefore, a demand on Scott was a demand on Eaton. See Thompson v. Stuckey, 300 S.E.2d 295, 299 (W.Va.1983). Although Scott gave Shamblin notice on December 21, 1984, effectively stating that it was not Eaton's agent and that it did not have the power to surrender the equipment, Shamblin had already made at least two demands on Scott prior to the date of the letter terminating the apparent agency. Those demands had been passed on to Eaton and had been rejected.
 
 
 19
 The defendants cite two cases where a demand on an agent was found to be insufficient to constitute a constructive demand on the party in possession. Mueller v. Technical Devices Corp., supra; First National State Bank of New Jersey v. Carlyle House, Inc., 102 N.J.Super. 300, 246 A.2d 22 (1968), aff'd, 107 N.J.Super. 389, 258 A.2d 545 (1969). In both of those cases, however, the agent had no authority, within the scope of his employment, to release the property even though he arguably had possession. In the present case, by contrast, Scott's inability to release the property was attributable solely to its lack of possession. Because the scope of its agency included the authority to receive goods for warranty consideration, it logically had the authority to release those goods to the owner upon demand--at least until the termination of its agency.
 
 
 20
 The court properly found that Shamblin, as a matter of law, made an adequate demand for return of the equipment. Therefore, there was no reversible error in the court's directed verdict. We further note that the amount of the compensatory damages properly reflects the value of the equipment at the time of the conversion. The equipment was nearly new and had been purchased for a total of $5,600, but was subject to repair for $2,069, leaving a value of $3,531 at the time of the conversion.
 
 III.
 
 21
 The defendants' second assignment of error concerns the court's refusal to grant a new trial or judgment n.o.v. on the award of punitive damages. We note first that under West Virginia law the jury may award punitive damages for conversion in order to punish the defendant and to deter others from engaging in a like course of conduct. Spencer v. Steinbrecher, 152 W.Va. 490, 164 S.E.2d 710, 712 (1968); see also Barker v. Traders Bank, 152 W.Va. 774, 166 S.E.2d 331 (1969). In order to award punitive damages for an action of tort, the jury must find gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations. Cook v. Heck's, Inc., 342 S.E.2d 453, 461 (W.Va.1986).
 
 
 22
 The defendants suggest that there was no evidence to support a jury finding that Scott and/or Eaton engaged in such egregious misconduct as to warrant an award of punitive damages.[1] While the defendants have made a strong argument on the point, we cannot say that, viewing the evidence most favorably to the plaintiff, there was not sufficient evidence to submit the issue of punitive damages to the jury. There was evidence, for example, from which the jury could have found that Eaton refused to return the equipment in order to extort from Shamblin the $2,069 cost of repair. Attempted extortion clearly would support an award of punitive damages. See Cook v. Heck's, Inc., 342 S.E.2d 453 (W.Va.1986). Therefore we find this contention to be without merit.
 
 
 23
 There was one evidentiary ruling that the defendants argue prejudiced them in their defense against the plaintiff's claim for punitive damage. After Shamblin filed its complaint and before the defendants filed their answer, Eaton offered unconditionally to return the equipment to Shamblin. The court properly excluded evidence of this offer for purposes of compensatory damages because once property has been converted, the owner does not have to accept its return but may sue instead for damages. Arnold v. Kelly, 4 W.Va. 642, 645 (1871); see also Contractors' Machinery & Storage Co. v. Stewart, 31 P.2d 546, 549-50 (Wash.1934). As we noted supra, the conversion was complete as soon as Eaton learned of Shamblin's demand and refused to return the equipment. We do not understand the defendants to controvert this ruling.
 
 
 24
 The defendants contend, however, that evidence of Eaton's offer to return the equipment was relevant to the issue of punitive damages, and that it should have been admitted for the purpose of showing Eaton's lack of malice. Although the defendants stipulated prior to trial that evidence of the offer would not be admissible to show mitigation of damages we can accept, for purposes of this argument, that they intended for this stipulation to apply only to mitigation of compensatory damages, not punitive damages. While the evidence may have had a minimal relevance on the possible award of punitive damages, we do not think the prejudice, if any, resulting from the rejection of that evidence alone is sufficient to have warranted a reversal of the judgment.
 
 IV.
 
 25
 The defendants next contend that even if their conduct should have been sufficient to support the imposition of punitive damages, the size of the award in this case was excessive. The defendants press two objections to the size of the award of punitive damages.
 
 
 26
 First, the defendants argue that under West Virginia law the award of punitive damages must have some relationship in amount to the award of compensatory damages, and that an award of $600,000 punitive damages in a case where the compensatory damages were $3,531 is so excessive as to violate this rule of proportionality. They cite in support of this argument Leach v. Biscayne Oil & Gas Co., 169 W.Va. 624, 289 S.E.2d 197 (1982). We considered this very argument, however, in Baker v. Kroger Co., 784 F.2d 1172 (4th Cir.1986). In that case we stated that "there does not have to be a reasonable relationship between compensatory and punitive damages" under West Virginia law but that "the amount of actual damages may be one of the criteria which a jury can consider in assessing punitive damages." Id. at 1176 n. 4. We recognize that the defendants take the position that Wells v. Smith, 297 S.E.2d 872 (W.Va.1982), which allows punitive damages in the complete absence of actual damages, does not change what had long been the law of West Virginia that any award of punitive damages must be proportional to the award of actual damages. This, in the defendants' opinion, would be the rule accepted by the West Virginia Court if we should certify the question to that court. Since we are reversing the judgment for punitive damages on other grounds, it is not necessary for us to resolve this issue either by certifying the question to the West Virginia Court or by considering whether the language in Baker, supra, was merely dictum. We do think a defendant, sued for the recovery of punitive damages, would at a minimum be entitled to an instruction that the amount of actual damages is one of the criteria the jury should consider in computing the amount of punitive damages to be awarded. That issue can only arise, though, on the retrial.
 
 
 27
 Second, the defendants contend that the magnitude of the punitive damages award is attributable to the jury's passion and prejudice rather than its reasoned decision-making. An appellate court may set aside a jury award of punitive damages if it is "monstrous and enormous, at first blush beyond all measure, unreasonable and outrageous, and such as manifestly shows jury passion, partiality, prejudice, or corruption." Roberts v. Stevens Clinic Hospital, Inc., 345 S.E.2d 791, 800 (W.Va.1986) (citing Addair v. Majestic Petroleum Co., Inc., 160 W.Va. 105, 232 S.E.2d 821 (1977)). Under the facts of this case we agree with the defendants that remarks made by Shamblin's counsel during the closing argument, and to which the defendants objected, so incensed the jury that the remarks tainted the award and require us to remand this case for a new trial on the size of the punitive damages.
 
 
 28
 To understand the prejudicial impact of these remarks of plaintiff's counsel, one must remember that shortly before the time of trial there had been many nationally publicized allegations of enormous waste in government contracts, especially contracts with the defense department. According to stories broadcast on the television networks and published in many newspapers and magazines, contractors were selling commonplace items to the government for hundreds or thousands of dollars when the off-the-shelf price of the item was merely a few dollars. Examples included a small hammer sold to the government for $436 when the manufacturer's sale price was only $7; three plastic caps for the legs of a stool on an AWACS radar plane which were sold to the government for $3,136.61, even though the commercial cost for the caps was 34 cents each; a wrench sold to the Pentagon for $900; a $7,600 coffee maker designed to brew coffee aboard the C-5A even under conditions that would have killed the crew; and high-priced toilet seats. See The Pentagon's 'Fanatic in the Attic' Fires Up His War on Waste, Business Week, July 16, 1984, at 62, 67; Lawmakers Scrutinizing Spare Parts Practices, 1984 Congressional Quarterly 671-72; How the Pentagon Spends Its Billions, Newsweek, Feb. 11, 1985, at 26, 28; and Conferees Bar Anti-Satellite Weapons Tests, Los Angeles Times, Dec. 14, 1985, Pt. 1, at 1, col. 6, and at 8, col. 1 (home ed.) Although these apparent attempts to bilk the government were often the creation of contractors' accounting practices rather than out-and-out price gouging, the American public was outraged by the thought that their tax dollars were being siphoned into the pockets of unscrupulous defense contractors. Eaton had had government contracts, but it was never implicated in these scandals.
 
 
 29
 Despite the complete absence of any deceit by Eaton in its contracts with the government, Shamblin argued to the jury that Eaton's earnings and capital may have been realized by "selling claw hammers to the defense department for a thousand dollars, toilet seats for eight hundred dollars." This argument had absolutely no basis in fact. There could be no possible purpose for such remarks except to incite the jury. Given the tenor of the times and the incessant publicity by newspapers, television, and radio of the corrupt practices in which some government contractors engaged, this kind of remark would automatically trigger passion and prejudice, suggest unfairly that Eaton was a corrupt, unscrupulous, and unpatriotic company, brand Eaton without the slightest basis in the record as one that had accumulated its wealth by defrauding its customers, and thus taint the jury's award. The very excessiveness of the award carries the most cogent evidence of the prejudicial character of these unfair and improper remarks.
 
 
 30
 Shamblin contends that its remarks were made for the legitimate purpose of rebutting Eaton's argument that it did not amass its wealth by cheating anyone. Although an improper argument may be excused when it has been invited by the opponent's improper argument, see Clemons v. Alton & Southern R. Co., 56 Ill.App.3d 328, 370 N.E.2d 679, 684 (1977), there was no such invitation in this case. Eaton's remark was, at worst, irrelevant but emotionally neutral. Shamblin's remark was both nonresponsive to that irrelevancy and emotionally charged. A new trial on punitive damages is necessary.
 
 V.
 
 31
 We can dispense quickly with the remaining issues on appeal. First, we find no reversible error in the admission of evidence supporting Shamblin's theory that Eaton refused to return the equipment in order to extort the $2,069 cost of repair. Even if we were to accept the defendants' weakly supported argument that Shamblin failed to disclose this theory during discovery, the defendants waived their right to claim surprise when they refused the court's offer to continue the trial so they could have time to prepare a defense against this theory.
 
 
 32
 Second, we find no reversible error in the court's refusal to use special interrogatories or special verdicts rather than a general verdict. The use of special verdicts is within the sound discretion of the court, Fed.R.Civ.P. 49, and we find no abuse of that discretion.
 
 
 33
 Third, we find no reversible error in the court's refusal to disqualify Shamblin's counsel after the defendants gave notice of their intent to call Shamblin's counsel as a defense witness. Under Disciplinary Rule 5-102 a lawyer may not be a witness for his client, but he can be a witness for any other party unless it is apparent that his testimony is or may be prejudicial to his client. Although Shamblin gave an affidavit stating that the attorney's testimony would not be harmful to the client and that a change of counsel would be a hardship, a client cannot waive Rule 5-102 because it is "for the protection of the bar and the integrity of the court." Supreme Beef Processors, Inc. v. American Consumer Industries, Inc., 441 F.Supp. 1064, 1068 (N.D.Tex.1977). Nonetheless, the party moving for disqualification has the burden of proving that the attorney's testimony would be adverse to his client. See Smith v. New Orleans Fed. Sav. & Loan Ass'n, 474 F.Supp. 742 (E.D.La.1969). We find no abuse of discretion in the court's determination that the defendants failed to meet their burden of proof.
 
 
 34
 Finally, we find no reversible error in the court's admission of evidence supporting the theory that the Eaton motor sold to Shamblin was used rather than new. Although the relevance of this theory seems marginal, at best, to the issue of conversion, we cannot say that the court abused its discretion in admitting the evidence.
 
 
 35
 For the reasons given above, we affirm the directed verdict on compensatory damages and the jury's determination that Eaton and Scott are liable for punitive damages. Because of inflammatory remarks made during closing arguments, we remand for a new trial on the size of the punitive damages award.
 
 
 36
 AFFIRMED IN PART; REMANDED IN PART.
 
 SPROUSE, Circuit Judge, dissenting:
 
 37
 I respectfully dissent. The remarks of defense counsel which the majority opinion characterizes as inflamatory, were made in response to the closing argument made by defense counsel. It was not based on evidence in the case, but neither was the defense argument that it had not amassed its wealth by cheating anyone. In my mind, both arguments were examples of improper hyperbole, but as far as the net effect on the jury, one simply neutralizes the other.
 
 
 
 [1]
 Because of a private agreement between Scott and Eaton, not made a part of the record in this case, concerning payment of judgments, we need not address the allocation of liability between the defendants for punitive damages