985 F.2d 553
 24 Fed.R.Serv.3d 1431
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Norman D. STEWART, Plaintiff-Appellee,
v.
William F. PEFFER; TNT Freight Express, Incorporated,
Defendants-Appellants.
 No. 92-1806.
 United States Court of Appeals,
Fourth Circuit.
 Argued: December 1, 1992
Decided: February 3, 1993
 
 Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling. William M. Kidd, Senior District Judge. (CA-90-5-W-K)
 M. Marshall Seeder, SACHNOFF & WEAVER, LTD., Chicago, Illinois, for Appellants.
 Frank X. Duff, III, SCHRADER, BYRD, BYRUM & COMPANION, Wheeling, West Virginia, for Appellee.
 Linda J. Pauel, SACHNOFF & WEAVER, LTD., Chicago, Illinois; Arden John Curry, II, PAULEY, CURRY, STURGEON & VANDERFORD, Charleston, West Virginia, for Appellants.
 Janet A. Sheehan, SCHRADER, BYRD, BYRUM & COMPANION, Wheeling, West Virginia; Mark F. McKenna, Peter D. Friday, WINTERS, MCKENNA & ARCOVIO, P.C., Pittsburgh, Pennsylvania, for Appellee.
 N.D.W.Va.
 REVERSED AND REMANDED.
 Before WILKINS, Circuit Judge, CHAPMAN, Senior Circuit Judge, and MORGAN, United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 Plaintiff Norman D. Stewart ("Stewart") is a truck driver who was injured when the tractor-trailer he was driving was struck from behind by another tractor-trailer driven by defendant William Peffer and owned by defendant TNT Freight Express, Inc.[1] Stewart filed suit in West Virginia state court for compensatory and punitive damages. TNT removed the case to the U.S. District Court for the Northern District of West Virginia.
 
 
 2
 TNT conceded liability and the jury trial was limited to the issue of damages. The jury returned a verdict against TNT in the amount of $100,800 lost earnings to the date of the trial and $536,700 in other compensatory damages for a total verdict of $637,500.
 
 
 3
 The district court denied TNT's post-trial motion to set aside the verdict as excessive. TNT now appeals the verdict to this court. We reverse on two grounds. First, the district court erroneously allowed the jury to consider expert testimony on the issue of future medical expenses, because plaintiff's expert Dr. Foughty did not testify to the requisite degree of certainty as to the amount or extent of future medical treatment the plaintiff would need. Second, the testimony of plaintiff's expert witness Dr. Romano constituted unfair surprise because certain important portions of Dr. Romano's testimony were not furnished to defense counsel until the day before trial, but plaintiff's economic expert had been notified of additions to Dr. Romano's testimony ten days before trial. The plaintiff's failure to notify the defendant of additions to Dr. Romano's proposed testimony until the day before trial violated both the letter and the spirit of Rule 26, Federal Rules of Civil Procedure. Therefore, we reverse the verdict and remand the case for a new trial on the issue of damages.
 
 I.
 
 4
 On January 7, 1988, plaintiff Stewart was driving his heavily loaded tractor-trailer up a hill on eastbound Interstate 70 near Wheeling, West Virginia when it was struck from behind by a tractor-trailer owned and operated by the defendants. At first, Stewart did not realize he had been in an accident and believed that his truck had experienced mechanical difficulties. The damages to Stewart's trailer resulting from the accident amounted to $871 in parts and $2,454 in labor charges. Most of the damage occurred to the trailer. At the time of the accident Stewart was in West Virginia on route from Dover, Ohio. After the accident Stewart did not seek medical attention and drove his tractor-trailer to the terminal. He then drove the truck 100 miles back to Ohio.
 
 
 5
 In February, 1988, Stewart was treated several times by chiropractor F.W. Andrews for back problems Stewart associated with the truck accident. He did not get medical attention again until Chiropractor Jack Foughty treated him from June 1988 until January 1989. Dr. Foughty testified that Stewart had initially suffered cervical strain or low-back strain or sprain in the accident. Foughty testified that Stewart's condition had improved during treatment, but that Stewart's injuries were permanent and that Stewart would require continuing chiropractic care. However, Foughty could not state with a reasonable degree of medical certainty how much future medical treatment Stewart would require or how much it would cost.
 
 
 6
 TNT objected to Dr. Foughty's testimony as to future chiropractic expenses on the ground that Dr. Foughty's testimony did not meet the standard of reasonable certainty required in West Virginia. Specifically, Dr. Foughty testified that Stewart "obviously has permanent injuries, and he will need care periodically. I cannot tell you how much care. Depends on the symptomatology he is going through at the time." At argument before the district court concerning the admissibility of Dr. Foughty's testimony about future medical treatment and expenses, the trial judge conceded "I don't know what the rule is ... " and then observed that doctors could not tell what was going to happen the next day.
 
 
 7
 The trial court enjoys broad discretion in determining the admission of expert testimony and it should not be reversed absent a clear abuse of discretion. Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989), cert. denied, 493 U.S. 1073 (1990). West Virginia law governs the standard for admission of expert testimony in this diversity action. Baker v. Kroger Co., 784 F.2d 1172, 1175 (4th Cir. 1986). In West Virginia, the standard for admitting expert testimony as to future medical expenses is as follows:
 
 
 8
 To support a relevant instruction on the recovery of future medical expenses, the plaintiff must offer proof to a degree of reasonable certainty which will indicate costs within an approximate range, as well as the necessity and reasonableness of such prospective medical charges.
 
 
 9
 Jordan v. Bero, 210 S.E.2d 618, 637 (W. Va. 1974); Turner v. Heston, 303 S.E.2d 718, 721 (W. Va. 1983).
 
 
 10
 Expert testimony which fails to meet the requisite degree of certainty as to the necessity and cost of future medical treatment is insufficient as a matter of law and should not be submitted to the jury. Jordan, 210 S.E.2d at 637; Turner, 303 S.E.2d at 721.
 
 
 11
 We find that Dr. Foughty did not testify to a reasonable degree of certainty on the issues of the amount or cost of Stewart's future medical care resulting from the accident. Therefore, we hold that the trial court abused its discretion in allowing the jury to consider Dr. Foughty's testimony on the issue of future medical expenses.
 
 II.
 
 12
 Stewart did not seek medical treatment for his alleged injuries from January 1989 until September 30, 1991. Stewart's trial was initially scheduled for November 12, 1991. On September 30, 1991, Stewart began seeing Dr. Thomas Romano.
 
 
 13
 However, Stewart did have regular physical examinations between January 1989 and September 30, 1991. On October 13, 1989, Stewart saw Dr. R.B. Giles for a U.S. Department of Transportation truck drivers examination. In his medical history report to Dr. Giles, Stewart did not mention that he had sustained or was suffering from an injury by accident. Dr. Giles's examination of Stewart did not reveal any back or spinal injuries. Stewart claims he lied to Dr. Giles about his injuries so that he would be able to continue to work as a truck driver.
 
 
 14
 On June 18, 1990, TNT's physician Dr. William R. Barton examined Stewart. Dr. Barton was also unable to find any evidence of neck or back problems in Stewart. Barton also found that Stewart had listed in his medical history that he was able to do sets of 10 bench presses of 120 pounds, do leg lifts in sets of 20 repetitions, bowl, and do situps in sets of 10.
 
 
 15
 On July 30, 1991, at the request of Stewart's counsel, Stewart was examined by Dr. John B. Talbot, who found no evidence of back or neck injuries.
 
 
 16
 Dr. Thomas Romano examined Stewart on September 30, 1991, and found Stewart to be suffering from "adhesive capsulitis" of the left shoulder and "fibromyalgia syndrome."
 
 
 17
 After receiving Dr. Romano's findings, TNT had Stewart examined on January 9, 1992 by Dr. Brian Houston, who found Stewart did not suffer from either adhesive capsulitis or fibromyalgia. Houston testified by videotape that he did not believe that there was much wrong with Stewart.
 
 
 18
 At trial Dr. Romano testified that Stewart would need extensive medical treatment for the rest of his life. Specifically, Dr. Romano testified that Stewart would require trigger-point injections, large joint injections, blood work, special pillows, and Zostrix cream on a continuing basis. Dr. Romano even displayed needles to graphically describe the treatment process. The testimony as to these injections, blood work, pillows and creams, and the costs thereof, was new and had not been revealed to defendant during discovery.
 
 
 19
 TNT objected to Dr. Romano's testimony at trial, on the grounds that Dr. Romano should not testify as to the trigger-point injections, large joint injections, blood work, special pillows, and Zostrix cream because they were not included in the itemized list of future medical damages about which Dr. Romano would testify. Stewart's counsel had provided the itemized list to TNT's counsel in response to a discovery request several months before trial.
 
 
 20
 TNT became aware of Dr. Romano's expanded findings when these specific treatments appeared in a report prepared by Stewart's economic expert witness John Davis. TNT received a fax of Davis's report the day before trial. Mr. Davis had been notified ten days prior to trial that Dr. Romano would testify that Stewart would require these additional treatments. As a result, Davis was able to incorporate the cost of these treatments into his testimony regarding Stewart's economic damages.
 
 
 21
 The timing of the disclosure of this expansion of Dr. Romano's testimony to witness Davis and later to defense counsel is important for two reasons. First, it is evidence of when this new medical information was available to plaintiff's attorney and when such attorney should have supplemented the information furnished under 26 Federal Rules of Civil Procedure.[2] Second, the expanded version of Dr. Romano's report was in the hands of plaintiff's attorney four days before trial when the deposition of defendant's medical expert, Dr. Brian Houston, was taken. Plaintiff's attorney was aware that Dr. Houston could not be available at trial and this absence was the reason for the deposition de bene esse. The attorney was also aware that this witness would be used to rebut the anticipated testimony of Dr. Romano, that substantial additions had been made to Dr. Romano's findings, and that Dr. Houston and defense counsel were unaware of these additions. This is the knowing concealment and unfair surprise that Rule 26(b)(4)(e)(2) is designed to prevent.
 
 
 22
 Plaintiff offers a weak argument that the late disclosure made no difference because Dr. Houston would have testified that these additional treatments and expenses were unnecessary. Such an excuse is not acceptable for such a flagrant violation of both the letter and the spirit of the law.
 
 
 23
 The advisory committee notes on the 1970 amendments to Rule 26(b)(4) of the Federal Rules of Civil Procedure state:
 
 
 24
 Effective cross-examination of an expert witness requires advance preparation. The lawyer, even with the help of his own experts frequently cannot anticipate the particular approach his adversary's expert will take or the data on which he will base his judgment on the stand ... Similarly, effective rebuttal requires advance knowledge of the line of testimony of the other side....
 
 
 25
 Expert testimony may be excluded to avoid unfair surprise. Basch v. Westinghouse Elec. Corp., 777 F.2d 165, 174-75 (4th Cir. 1985), cert. denied, 476 U.S. 1108 (1986).
 
 
 26
 Therefore, we hold that the trial court abused its discretion in allowing Dr. Romano to testify that Stewart would require triggerpoint injections, large joint injections, blood work, special pillows and Zostrix cream, and in allowing the jury to consider this evidence in arriving at its verdict.
 
 
 27
 For the reasons stated above the verdict reached in the district court is reversed and the case is remanded for a new trial on the issue of damages.
 
 REVERSED AND REMANDED
 
 
 [1]
 Hereafter both defendants will collectively be referred to as "TNT"
 
 
 [2]
 Fed. R. Civ. P. 26(b)(4)(e) states in part:
 A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired, except as follows:
 (1) A party is under a duty seasonably to supplement the response with respect to any question directly addressed to ... the identity of each person expected to be called as an expert witness at trial, the subject matter of which the person is expected to testify, and the substance of the person's testimony.
 (2) A party is under a duty seasonably to amend a prior response if the party obtains information upon the basis of which (A) the party knows that the response was incorrect when made, or (B) the party knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.